[No. F054863. Fifth Dist. Jan. 28, 2009.]

Conservatorship of the Person of HARRISON BURTON.
KIMBERLY HOLLAND, as Associate Warden, etc., Petitioner and
Respondent, v.
HARRISON BURTON, Objector and Appellant.

COUNSEL

Rudolph Kraft III, under appointment by the Court of Appeal, for Objector and Appellant.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Jessica N. Blonien and Christopher J. Rench, Deputy Attorneys General, for Petitioner and Respondent.

OPINION

**WISEMAN, Acting P. J.**—In this case we resolve a conflict in statutory language relating to mental capacity to give or refuse consent to medical treatment. Harrison Burton, a state prison inmate, argues that, although he embarked on a hunger strike based on delusional beliefs, the Probate Code gave him the right to continue the hunger strike because his mental condition

did not impair his understanding of its potential fatal consequences. He expresses his view this way in his opening brief: "The [Probate Code] does not grant the authority to a court to take away an individual's right to make health care decisions for . . . stupid *or, even, delusional* reasons." (Italics added.)

The trial court ruled that the delusional beliefs meant Burton's decision was not based on a rational thought process and that under the code he therefore lacked the mental capacity to refuse the nourishment (and medicine) prison doctors sought to compel him to take. The court granted the doctors' petition to authorize prison administrators to consent to treatment on Burton's behalf. We agree with the trial court.

## *FACTUAL AND PROCEDURAL HISTORIES*

As a result of the latest in a series of hunger strikes, Burton was admitted to a prison infirmary in August 2007. He refused to eat but consented to drink juice.

A prison psychiatrist explained that Burton engaged in the hunger strike for delusional reasons: "He believes that he is on a hunger strike as a kind of martyr for the other inmates who are being tortured by female correctional officers who go into the tower and take off their clothes and then proceed to insert objects into their vaginas in view of the other inmates so as to torture them. [¶] He also believes . . . that his food is contaminated; that officers are spitting into his food or, in other words, in other ways poisoning his food. [¶] . . . [¶] And that his hunger strike, if he succumbs that he will then be able to—that there will be the possibility of pursuing legal action so as to improve the condition of the other inmates." Burton's fear of poisoning also extended to his medicine; he would take tablets but not capsules, which might have been tampered with. Another prison physician stated that Burton heard voices that told him not to abandon the hunger strike. These were the same voices that told Burton to commit the crime for which he was incarcerated. Burton's delusions were fixed, meaning that he believed in them continuously, not intermittently.

The delusions resulted from paranoid schizophrenia. Burton's other symptoms included visual and auditory hallucinations.

Burton has hepatitis C, which worsened as the hunger strike went on and degraded his immune system. He had lost a substantial amount of weight since beginning the hunger strike. If he continued to take only juice, he would eventually experience kidney and liver failure and, ultimately, death.

Both doctors believed Burton understood the consequences of the hunger strike. They filed the petition in spite of this because they concluded that Burton's delusions meant his refusal to take nourishment was not the result of a rational thought process. The psychiatrist testified:

"Mr. Burton has—is a very, very intelligent man, and he has a comprehensive understanding of the effects of a hunger strike on his medical condition, including the possibility of death.

"The Petition is not based on his understanding of the consequences of his action. The Petition is based on the motivation behind his action, which is psychotic."

The psychiatrist agreed when the court asked him if his position was "that the fact that a person understands the consequences in and of itself does not make him or her able to give informed medical consent . . . ."

The doctors' Probate Code section 3201 petition for a determination of a lack of capacity to make health care decisions was filed on December 6, 2007. The court held the hearing on January 29, 2008. Based on the psychiatrist's testimony, the court found that treatment was necessary to prevent a life-endangering condition, and Burton was not able to give informed medical consent. The same day, it issued a written order authorizing Kimberly Holland, Associate Warden of Health Care for the California Substance Abuse Treatment Facility, to make health care decisions for Burton.

## DISCUSSION

I.  *Standard for mental capacity to give or refuse consent to medical treatment: rational thought process and understanding of consequences*

Burton argues that the court applied the wrong standard in determining that he lacked the mental capacity to refuse consent to medical treatment (that is, in this case, to refuse either to eat or to be nourished through a feeding tube). He says he could properly be found to lack mental capacity only if he did not understand the consequences of his decision. Holland, who is the respondent in this appeal, argues that the court was correct in believing that the absence of a rational thought process as a foundation for the refusal of treatment meant Burton lacked mental capacity. This dispute, which arises from conflicting language in the Probate Code, presents an issue of law that we review de novo. (*People ex rel. Lockyer v. Shamrock Foods Co.* (2000) 24 Cal.4th 415, 432 [101 Cal.Rptr.2d 200, 11 P.3d 956].)

■ In interpreting statutes, our objective is "to ascertain and effectuate legislative intent." (*People v. Woodhead* (1987) 43 Cal.3d 1002, 1007 [239 Cal.Rptr. 656, 741 P.2d 154].) To the extent the language in the statute may be unclear, we look to legislative history and the statutory scheme of which the statute is a part. (*People v. Bartlett* (1990) 226 Cal.App.3d 244, 250 [276 Cal.Rptr. 460].) We look to the entire statutory scheme in interpreting particular provisions "so that the whole may be harmonized and retain effectiveness." (*Clean Air Constituency v. California State Air Resources Bd.* (1974) 11 Cal.3d 801, 814 [114 Cal.Rptr. 577, 523 P.2d 617].) "In the end, we ' "must select the construction that comports most closely with the apparent intent of the Legislature, with a view to promoting rather than defeating the general purpose of the statute, and avoid an interpretation that would lead to absurd consequences." [Citation.]' " (*Torres v. Parkhouse Tire Service, Inc.* (2001) 26 Cal.4th 995, 1003 [111 Cal.Rptr.2d 564, 30 P.3d 57].)

■ Probate Code section 3201[1] allows a petition to be filed to determine that a patient possesses or lacks the capacity to make a health care decision. Section 3208 allows the court to make an order authorizing the recommended health care and designating a person to give consent on the patient's behalf if the court finds, among other things, that "[t]he patient is unable to consent to the recommended health care."

Section 811 provides in part: "(a) A determination that a person is of unsound mind or lacks the capacity to make a decision or do a certain act, including, but not limited to, the incapacity to contract, to make a conveyance, to marry, to make medical decisions, to execute wills, or to execute trusts, shall be supported by evidence of a deficit in at least one of the following mental functions, subject to subdivision (b), and evidence of a correlation between the deficit or deficits and the decision or acts in question: [¶] . . . [¶]

"(3) Thought processes. Deficits in these functions may be demonstrated by the presence of the following: [¶] . . . [¶]

"(C) Delusions. [¶] . . . [¶]

"(b) A deficit in the mental functions listed above may be considered only if the deficit, by itself or in combination with one or more other mental function deficits, significantly impairs the person's ability to understand and appreciate the consequences of his or her actions with regard to the type of act or decision in question."

---

[1] Subsequent statutory references are to the Probate Code.

Section 813 provides: "(a) For purposes of a judicial determination, a person has the capacity to give informed consent to a proposed medical treatment if the person is able to do all of the following:

"(1) Respond knowingly and intelligently to queries about that medical treatment.

"(2) Participate in that treatment decision by means of a rational thought process.

"(3) Understand all of the following items of minimum basic medical treatment information with respect to that treatment:

"(A) The nature and seriousness of the illness, disorder, or defect that the person has.

"(B) The nature of the medical treatment that is being recommended by the person's health care providers.

"(C) The probable degree and duration of any benefits and risks of any medical intervention that is being recommended by the person's health care providers, and the consequences of lack of treatment.

"(D) The nature, risks, and benefits of any reasonable alternatives.

"(b) A person who has the capacity to give informed consent to a proposed medical treatment also has the capacity to refuse consent to that treatment."

██ The parties' dispute is centered on the conflict between section 811, subdivision (b), and section 813, subdivision (a)(2). The latter provision makes an ability to "[p]articipate in [the] treatment decision by means of a rational thought process" a necessary condition for mental competence to give or refuse consent to medical treatment, while the former forbids a court ruling on mental competence to consider a deficit in thought processes unless the deficit "significantly impairs the person's ability to understand and appreciate the consequences" of giving or refusing consent. ██ Burton says the trial court was required to deny the petition under section 811 because he understood the consequences of the hunger strike; Holland says the court correctly granted the petition under section 813 because, in light of his delusions, Burton could not participate in the decision by means of a rational thought process.

Holland has the better of this dispute. The language that is now section 811, subdivision (b), and section 813, subdivision (a)(2), became law at the same

time. Both were parts of chapter 842 of the Statutes of 1995, known as the Due Process in Competence Determinations Act. (Stats. 1995, ch. 842, §§ 4, 5, 12, pp. 6408, 6409, 6413.)[2] Under the most plausible interpretation of section 813, the Legislature intended that section to set a freestanding definition of mental capacity to give or refuse consent to medical treatment, consisting of three abilities: to respond knowingly and intelligently (§ 813, subd. (a)(1)); to participate via a rational thought process (§ 813, subd. (a)(2)); and to understand the listed items of information (§ 813, subd. (a)(3)). It would have made little sense for the Legislature to draft section 813 as it did if it intended a person unable to participate in a medical treatment decision by means of a rational thought process to be deemed competent so long as the person understood the consequences of his or her irrational thought process. If the Legislature had intended a patient's unimpaired understanding of the consequences of a decision—even an irrational decision based on delusions—to be a trump card rendering the patient competent in all cases, it could have said so within section 813.

■　Section 3204, subdivision (h)—which was also added to the Probate Code as part of the 1995 legislation[3]—supports our conclusion. It provides that a section 3201 petition shall state: "The deficit or deficits in the patient's mental functions listed in subdivision (a) of Section 811 that are impaired, and an identification of a link between the deficit or deficits and the patient's inability to respond knowingly and intelligently to queries about the recommended health care or inability to participate in a decision about the recommended health care by means of a rational thought process." (§ 3204, subd. (h).) The important point here is that the petition must identify a link between a mental deficit and an "inability to respond knowingly and intelligently" or an "inability to participate in a decision . . . by means of a rational thought process" (§ 3204, subd. (h))—*not*, as in section 811, a link between a mental deficit and an impairment of the patient's "ability to understand and appreciate the consequences" of the decision (§ 811, subd. (b)). This reinforces the view that an inability to participate in a health care decision by means of a rational thought process shows lack of capacity even in the absence of an impairment of the patient's understanding of the consequences.

■　We are also guided by the canon of statutory interpretation stating that a specific statutory provision controls over a general one where the two

---

[2] As enacted in 1995, current section 811 was codified as section 812. The present numbering was established by an amendment in 1996. (Stats. 1996, ch. 178, §§ 2–4, pp. 1389–1390.)

[3] Section 3204 was enacted in 1990 when the entire Probate Code was repealed and reenacted. (Stats. 1990, ch. 79, § 14, pp. 463, 645–646.) Subdivision (h) of section 3204 was added in 1995. (Stats. 1995, ch. 842, § 10, p. 6412.) Nonsubstantive amendments were adopted in 1996 and 1999. (See Historical and Statutory Notes, 53 West's Ann. Prob. Code (2009 supp.) foll. § 3204, p. 33.)

relate to the same subject matter but conflict. (*People v. Hawes* (1982) 129 Cal.App.3d 930, 936–937 [181 Cal.Rptr. 456].) ██ Section 811 purports to govern medical decisions *among others* (i.e., decisions to contract, to make a conveyance, to marry, and to execute wills and trusts), while section 813 governs *only* the capacity to give or refuse informed consent to medical treatment. This makes it the more specific provision, so it controls over section 811 where, as here, the two conflict.

██ It is probable that the Legislature did not foresee a situation in which a person lacked a rational thought process and therefore could not give or refuse consent under section 813 but had an unimpaired understanding of the consequences of his decision and therefore could not meet the requirements for a lack-of-capacity finding under section 811. Where parts of a statutory scheme conflict in this manner, it is our duty to harmonize them or give one effect over another; we are obliged to find a way to make the statutory scheme sufficiently coherent to meet the demands of the case before us. (See *Clean Air Constituency v. California State Air Resources Bd., supra*, 11 Cal.3d at p. 814.) In other words, something has to give in this case. For the reasons we have stated, it is section 811, subdivision (b), that must do so.

## II. *The meaning of "rational thought process"*

Burton argues that, even if the rational-thought-process standard of section 813 is applicable, the trial court employed an erroneous analysis in determining whether his thought process was rational. He says the court should not have focused on the undisputed fact that his thought process proceeded from delusional beliefs. Instead, it should have considered only whether, given that Burton believed he had something to protest, a hunger strike was a rational means of protesting. Then, he says, the court would have had no basis for finding his thought process irrational: "If, for example, [Burton] had engaged in the hunger strike to protest the war in Iraq, that would not be considered to be an irrational thought process even though, as a practical matter, a hunger strike by one California prisoner would have no effect on the war in Iraq. Similarly, if [Burton] were engaging in this behavior out of some religious motivation, no one would suggest that the rationality of his religion could be evaluated and the decision as to whether or not to force medical treatment on him would be based on that evaluation. After all, from an outsider's perspective, most, if not all, religions have irrational components that would lead to an outsider believing that the members of the religion were making irrational decisions."

There is no likelihood that the Legislature intended a "rational thought process" as that term is used in section 813 to include a thought process based on undisputedly delusional beliefs. Burton's two examples do not show

the contrary. A hunger strike might not end the war in Iraq, but the war in Iraq is real. Section 3212 deals with religious beliefs explicitly: "Nothing in this part shall be construed to supersede or impair the right of any individual to choose treatment by spiritual means in lieu of medical treatment, nor shall any individual choosing treatment by spiritual means, in accordance with the tenets and practices of that individual's established religious tradition, be required to submit to medical testing of any kind pursuant to a determination of capacity." The court did not err in finding that Burton's decision to refuse nourishment was based on an irrational thought process.

## *DISPOSITION*

The judgment is affirmed. The parties shall bear their own costs on appeal.

Cornell, J., and Hill, J., concurred.